**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x

OTG BRANDS, LLC and DNE
NUTRACEUTICALS INC.,

                             Plaintiffs,

            -against-

WALGREEN CO., et al.,

                          Defendants.

------------------------------------------------------------x

:
:
:
:
:   1:13-cv-09066 (ALC)
:
:   **OPINION & ORDER**
:
:
:
:
:

ANDREW L. CARTER, JR., United States District Judge:

## I.     INTRODUCTION

Plaintiffs OTG Brands, LLC ("OTG") and DNE Nutraceuticals, Inc., ("DNE")

(collectively referred to herein as "Plaintiffs") bring this case against Walgreen Co.

("Walgreens") and four others, in connection with disputes arising out of Walgreens' offering

their product.  Defendants now move to dismiss.

## II.     SECOND AMENDED COMPLAINT

### A.   Register Rewards

Plaintiff OTG is a New Jersey corporation that develops formulates, and markets over-

the-counter natural multi-vitamin drink mix in a variety of flavors.  (Second Am. Compl. ¶ 12.)

DNE is New Jersey corporation that develops, formulates, and markets over-the-counter

nutritional pharmaceutical products for manufactures and distributes OTG products.  (Second

Am. Compl. ¶ 15.)  DNE worked with OTG to submit the products at issue in this case to

Walgreens.  (Second Am. Compl. ¶ 19.)

The Complaint alleges that in November 2011, Walgreens, purchased the multi-vitamin

drink mix from OTG.  (Second Am. Compl. ¶ 53.)  Shortly after this purchase, OTG claims it

was advised by Walgreens that it would would not continue to offer its product unless OTG

agreed to participate in Walgreens' Register Rewards promotion ("Register Rewards") which

Walgreens has run at its stores for several years with different vendors, and is typically run on a

weekly or monthly basis. (Second Am. Compl. ¶ 54.) Under the promotion, a point of sale

machine installed by Defendant Catalina Marketing Corporation ("Catalina") prints a coupon

when an advertised product is purchased by a Walgreens customer. (Second Am. Compl. ¶ 42.)[1]

The customer can use the coupon for the future purchase of other items at a Walgreens store,

subject to some limited exceptions. (Second Am. Compl. ¶ 42.) Vendors agree to reimburse

Walgreens for the face value of each promotion coupon redeemed by a customer. (Second Am.

Compl. ¶ 45.) Defendant NCH Marketing Inc. ("NCH") processes the redeemed coupons and

then invoices the vendor pursuant to an agreement it has with Walgreens. (*See* Second Am.

Compl. ¶¶ 123, 139.)

OTG agreed to participate in the Register Rewards at some point between December

2011 and early 2012. (*See* Second Am. Compl. ¶¶ 57, 76.) OTG claims that, before agreeing to

participate, it reviewed information about the Register Rewards promotion that Walgreens has on

intranet site for its vendors. (Second Am. Compl. ¶ 76.) Plaintiffs allege that the website stated

that the coupons would only be printed for the purchase of in-stock merchandise, that it could

only be earned on eligible items, that a customer could only receive one per offer, per

transaction, and that the coupons were only redeemable during a certain period and for certain

eligible items. (Second Am. Compl. ¶¶ 43, 44, 76.) OTG also claims that it was advised by an

---

[1]     The Complaint also alleges that Catalina conducts research about the viability of the program
which is then utilized in marketing efforts to induce manufacturers to participate in the program. (Second
Am. Compl. ¶ 46.) The Complaint does not specifically allege that such research was ever presented to
Plaintiffs, however.

agent of Walgreens that the promotion would be administered according to the guidelines should it participate. (Second Am. Compl. ¶ 74.) However, OTG alleges that it was not apprised by Walgreens of the fact that, in November 2011, a vendor had filed suit against it in the United States District Court for the Northern Illinois, *see Imagenetix v. Walgreen*, No. 11 CV 8277, alleging claims of fraud, breach of contract and unjust enrichment in connection with Walgreens' administration of the promotion. (*See, e.g.*, Second Am. Compl. ¶ 4.)

OTG's promotion ran from February 26, 2012 to March 3, 2012. (Second Am. Compl. ¶ 76.) Customers paid $8 for one of OTG's products and would receive a coupon of equal value for use at Walgreens. (Second Am. Compl. ¶ 76.) If the customer redeemed the coupon, he or she would be credited the $8 toward the purchase of another product. (Second Am. Compl. ¶ 76.) For the one-week promotion, Walgreens ordered 145,000 units from OTG, but canceled 40,000 units and ultimately purchased 105,000 units. (Second Am. Compl. ¶¶ 71-72.) OTG claims that this resulted in inventory which has not been moved or sold, and a loss of $75,000 in credit that they would have received had the merchandise been sold. (Second Am. Compl. ¶ 73.)

After the promotion had concluded, Walgreens, Catalina and NCH "represented through invoices, statement [sic] and emails to OTG that 78,132 of the 83,199 coupons [issued] had been redeemed by consumers." (Second Am. Compl. ¶ 78.) Between March and September 2012, NCH billed OTG approximately $662,984.56 for the purportedly redeemed coupons, which included handling fees of $0.08 per coupon scanned in the total amount of $6,655.92. (Second Am. Compl. ¶¶ 79, 80.) While OTG believed that the redemption rate of over 94 percent was "excessively high," it paid approximately half the invoiced amount, or $352,916.77. (Second Am. Compl. ¶ 104.) Because of their concerns, however, OTG self-audited the program. (Second Am. Compl. ¶ 83.)

OTG concluded after the audit that "more than 30% of the coupons were fraudulent for one reason or another," and accordingly refused to pay the remaining balance due. (Second Am. Compl. ¶¶ 83, 106.) OTG claims, for example, that approximately 50% of coupons sampled during the audit were in pristine condition, and that this is suspect since the guidelines state that a customer can only redeem a coupon during a subsequent transaction. (Second Am. Compl. ¶ 83.) OTG also notes that the coupons show that many Walgreens stores sold more than the 12 units it believes they each would have had in stock, and that one register in particular processed a staggering 87 coupons in a mere five-hour period. (Second Am. Compl. ¶¶ 90, 92.) Other alleged indicia of fraud include the facts that some coupons had the same number, were expired, have consecutive redemption numbers, were issued for other manufacturers, and/or redeemed at non-Walgreens stores. (*See* Second Am. Compl. ¶¶ 91, 93, 96.)

The Complaint alleges that "upon information and belief," Walgreens cashiers and agents made sham purchases of OTG product, received a coupon, and then discarded the product or returned it back to the shelves for purchase by other customers. (Second Am. Compl. ¶ 87.) OTG alleges that they subsequently requested that Walgreens and Catalina provide it with a list of participating stores that issued coupons so that it could further investigate its suspicions, and that Walgreens refused unless OTG agreed to a nondisclosure agreement. (Second Am. Compl. ¶ 49.) The Complaint alleges that Walgreens advised OTG on January 28, 2013 that it would no longer carry any of OTG's product line. (Second Am. Compl. ¶ 141.)

### B.    Price Reduction Agreement

The Complaint also alleges that, prior to the Register Rewards promotion, OTG and Walgreens had entered into an agreement under which Walgreens would agree to sell OTG's product at $9.99 to its customers in exchange for OTG paying Walgreens $1.25 for every unit

sold. (*See* Second Am. Compl. ¶¶ 131, 33.)  Walgreens had originally priced OTG's product at $12.99 per unit, but OTG felt to be "competitive" its product should be priced lower. (Second Am. Compl. ¶ 131.)

OTG alleges that, despite the agreement, OTG principals visited stores and saw that the product was priced higher than $9.99. (Second Am. Compl. ¶ 132.)  The Complaint alleges that, in breach of the price reduction agreement, Walgreens billed OTG $110,615 for units sold for less than $12.99, and also inappropriately charged it $1.25 for each unit sold during the Register Rewards promotion, because those units were already effectively free to Walgreens. (Second Am. Compl. ¶ 137.)  The Complaint alleges that Walgreens "added th[is] figure to its 'account'" that OTG ultimately paid the amount and that Walgreens has failed to return it. (Second Am. Compl. ¶¶ 138, 213-30.)[2]

## C. David Betrus & TM Marketing and Sales

Defendant David Betrus is a Missouri resident and business broker who was the sole officer of Defendant TM Marketing and Sales, Inc, ("TM Marketing"), which was a Missouri corporation until its corporate status lapsed in 2010. (Second Am. Compl. ¶ 29.)  At some point

---

[2]     The Court is mindful that that the Complaint is seemingly internally inconsistent on the point of whether OTG actually paid Walgreens, in one form or another, the $110,615. (*See, e.g.*, Second Am. Compl. ¶¶ 82, 138 (suggesting that amount was only added to the account).)  The Court notes, however, that the majority of the allegations on the subject in the Second Amended Complaint, as well as Plaintiffs' opposition to Defendant Walgreens' motion to dismiss, suggest that OTG in fact alleges that it paid the amount.  Further, this being a motion to dismiss, the Court will construe the allegations in the light most favorable to Plaintiffs. *See, e.g.*, *Wilk v. VIP Health Care Servs., Inc.*, No. 10 Civ. 5530(ILG)(JMA), 2012 WL 560738, at *2 n.1 (E.D.N.Y. Feb. 21, 2012) (resolving inconsistency in complaint based on plaintiff's submissions on motion); *Nathe v. Weight Watchers Int'l, Inc.*, No. 06 Civ. 4154(LTS)(DFE), 2007 WL 2729015, at *3 (S.D.N.Y. Sept. 13, 2007) (construing arguably internally inconsistent allegations in light favorable to plaintiff on motion to dismiss).

before December 2011, OTG hired David Betrus as its "agent in negotiating a deal to market OTG's multi-vitamin drink mix to Walgreens." (*See* Second Am. Compl. ¶¶ 113, 233.)

In connection with the Register Rewards promotion, the Complaint alleges that Betrus told OTG that he thought "the resulting sales for the one week promotion would satisfy Walgreens' vendors requirements." (Second Am. Compl. ¶ 241.) OTG also alleges that Betrus told it that if it followed his instructions, OTG would be successful in marketing and selling their product to Walgreens and that, in addition, if OTG participated in the Register Rewards promotion, Walgreens would sell their product nationwide for at least two years. (Second Am. Compl ¶¶ 237-38.) The Complaint alleges that Betrus's "professional opinion . . . ultimately induced [OTG] to agree to participate in the FARR program." (Second Am. Compl. ¶ 259.)

The Complaint also alleges that Betrus made a number of representations to OTG about product design changes that Walgreens desired. (Second Am. Compl. ¶ 248.) The Complaint further alleges that Walgreens agent Scott Minger made representations that it would purchase more product if OTG rebranded and reprinted its packaging and created new supplemental product lines. (Second Am. Compl. ¶ 111.) OTG in fact redid the design and shipped its first volume shipment to Walgreens in December 2011. (Am. Compl. ¶ 113.)

OTG claims that after the shipment, its Chief Executive Officer, Uri Evan, met with Betrus in Atlanta to discuss future sales and expansion of the OTG brands. (Am. Compl. ¶ 114.) OTG claims that Betrus referred Evan to a design and supply chain in New York called Strategic Marketing & Promotions ("SMP"). (Second Am. Compl. ¶ 115.) Evan met with SMP, but SMP failed to produce designs he found satisfactory. (Second Am. Compl. ¶ 115.) The Complaint alleges that Betrus subsequently directed OTG to submit entirely new designs, and OTG thus commissioned another New York design firm to create them. (Second Am. Compl. ¶ 116.) The

6

Complaint also alleges that Betrus rejected those new designs and insisted that OTG make changes to some of the packaging and also that it retain a company in Georgia, with which he had a relationship, to produce new designs which Betrus ultimately indicated would be satisfactory to Walgreens and lead to additional orders. (Second Am. Compl. ¶¶ 116-17.)

The Complaint alleges that, despite these representations, and a nearly $25,000 investment in the product design, Walgreens only ordered minimal product, excluding that ordered in connection with the Register Rewards promotion. (Second Am. Compl. ¶ 118.) The Complaint further alleges that Walgreens later released its own private label product which bears similarities to OTG's product. (Second Am. Compl. ¶ 120.) In all, however, OTG claims it paid Betrus over $100,000 for his services. (Second Am. Compl. ¶ 259.)

### D. Procedural History

Plaintiffs commenced this action against Walgreens, Catalina, NCH, TM Marketing and Betrus on December 23, 2013, and filed the operative Second Amended Complaint on April 28, 2014. Counts I through IV and Count VIII pertain to the Register Rewards program. Count I asserts a claim of fraud against all Defendants. Counts II, III, and IV assert claims of breach of contract, conversion, and unjust enrichment, respectively, against Walgreens, Catalina and NCH. Counts V and VI assert claims of conversion and unjust enrichment, respectively, against Walgreens only in connection with the price reduction arrangement. Count VII alleges negligence and breach of fiduciary duty against TM Marketing and Betrus in connection with his representation of and dealings with Plaintiffs. Plaintiffs seek punitive damages from all Defendants.

On May 30, 2014, Defendants Walgreens, Catalina and NCH filed a motion to dismiss to the Complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a

claim, and also to strike Plaintiffs' request for punitive damages under Rule 12(f) of the Federal

Rules of Civil Procedure. (ECF Nos. 38, 42.) Also on May 30, 2014, Defendants Betrus and

TM Marketing filed a motion to dismiss the claims against them under Rule 12(b)(2) of the

Federal Rules of Civil Procedure for lack of personal jurisdiction. (ECF No. 40.)

### III.   CATALINA, WALGREENS AND NCH'S MOTIONS TO DISMISS AND TO STRIKE

#### A. Legal Standards

In order to survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil

Procedure, a complaint must plead enough facts to "state a claim to relief that is plausible on its

face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly v. Bell Atl. Corp.*, 550 U.S.

544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that

allows the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). In determining the legal sufficiency of the

Amended Complaint, this Court "must accept as true all factual allegations and draw from them

all reasonable inferences." *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) (quoting *Rothstein*

*v. UBS AG*, 708 F.3d 82, 94 (2d Cir. 2013)). This Court, however, is not bound by legal

conclusions masquerading as factual allegations. *See id.* (quoting *Rothstein*, 708 F.3d at 94); *see*

*also Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).

Under Rule 12(f), "[t]he court may strike from a pleading ... any redundant, immaterial,

impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). "To prevail on a [Rule 12(f)] motion to

strike, a party must demonstrate that (1) no evidence in support of the allegations would be

admissible; (2) that the allegations have no bearing on the issues in the case; and (3) that to

permit the allegations to stand would result in prejudice to the movant." *In re Fannie Mae 2008*

8

*Sec. Litig.*, 891 F. Supp. 2d 458, 471 (S.D.N.Y. 2012); *see also Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893 (2d Cir. 1976) ("In deciding whether to strike a Rule 12(f) motion on the ground that the matter is impertinent and immaterial, it is settled that the motion will be denied, unless it can be shown that no evidence in support of the allegation would be admissible." (*Gleason v. Chain Serv. Rest.*, 300 F. Supp. 1241 (S.D.N.Y. 1969)).

"'Resolution of a Rule 12(f) motion is left to the district court's discretion.'" *Cosa Xentaur Corp. v. Bow*, No. 13–CV–2912, 2014 WL 1331030, at *16 (E.D.N.Y. Mar. 31, 2014) (quoting *E.E.O.C. v. Bay Ridge Toyota, Inc.*, 327 F. Supp. 2d 167, 170 (E.D.N.Y. 2004)).

In the interests of clarity and convenience, the Court will first address Walgreens, Catalina and NCH's motions to dismiss, and then address the motions to strike if necessary.

### B. Fraud

To demonstrate a fraud under New York law, a plaintiff must establish (1) a material representation of fact, (2) that the representation was false; (3) the defendant made the statement with intent to deceive plaintiff, (4) the plaintiff justifiably relied upon the statement, and (5) plaintiff suffered pecuniary damages as result of the reliance. *See, e.g., Ross v. Louise Wise Servs., Inc.*, 8 N.Y.3d 478, 488 (2007).[3]  In this case, the Complaint alleges that Walgreens, Catalina and NCH made knowingly false and material statements to Plaintiffs to induce them to participate in the Register Rewards program, when they knew or should have known about coupon redemption fraud based on the filing of the *Imagentix* complaint. (*See, e.g.*, Second Am.

---

[3]     As the parties' briefs assume that New York law governs Plaintiffs claims, the Court will apply it without a choice-of-law inquiry. *See Golden Pacific Bancorp v. FDIC*, 273 F.3d 509, 514 n. 4 (2d Cir. 2001) ("The parties' briefs assume that New York substantive law governs the issues of contract interpretation and statute of limitations here, and such implied consent is, of course, sufficient to establish the applicable choice of law." (citing Krumme v. WestPoint Stevens Inc., 238 F.3d 133, 138 (2d Cir. 2000)).

Compl. ¶¶ 142-58.)  The Complaint further asserts that, in reliance upon the aforementioned representations, OTG agreed to participate in the FARR program and paid Walgreens for coupons that were not validly redeemed, and that OTG in connection with the price reduction agreement.  (*See, e.g.*, Second Am. Compl. ¶¶ 158-65.)

For several reasons, Plaintiffs' fraud claims must be dismissed against all Defendants. Initially, the Complaint fails to allege any *intentional* misrepresentation by NCH, or any misrepresentation made by Walgreens, Catalina or NCH to DNE.  Moreover, even if the Complaint was not lacking in that regard, the fraud claims are not viable because they are merely breach of contract claims dressed up in the garb of fraud.  *See, e.g.*, *Sudul v. Computer Outsourcing Servs.*, 868 F. Supp. 59, 62 (S.D.N.Y. 1994) ("A long line of New York courts . . . . have held that, where a fraud claim arises out of the same facts as plaintiff's breach of contract claim, with the addition only of an allegation that defendant never intended to perform the precise promises spelled out in the contract between the parties, the fraud claim is redundant and plaintiff's sole remedy is for breach of contract.").  The exceptions to the general rule barring such duplicative fraud claims, i.e., that a plaintiff seek to enforce a separate legal duty apart from the alleged contract, that the misrepresentation be collateral to or extraneous the contract, or that special damages caused by the misrepresentation are not recoverable in contract, are also not applicable here.  *See, e.g.*, *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 19 (2d Cir. 1996).

Plaintiffs also cannot salvage their fraud claims by, as they have attempted to on the present motion, recasting them as claims for fraud in the inducement.  Such a claim requires that, in addition to the above-stated elements of fraud, the plaintiff to prove that "the defendant had a duty to disclose material information." *Banque Arabe et Internationale D'Investissement v. Md.*

*Nat'l Bank*, 57 F.3d 146, 153 (2d Cir. 1995). In this case, such a claim fails because there are no allegations that Walgreens, NCH or Catalina had a confidential or fiduciary relationship with either OTG or DNE, and such a relationship is generally required in order to find a duty to disclose material information. *See Remington Rand Corp. v. Amsterdam–Rotterdam Bank, N.V.*, 68 F.3d 1478, 1483 (2d Cir.1995).

In sum, for these and other reasons, Plaintiffs' fraud claims must be dismissed for failure to state a claim.

### C. Breach of Contract

To establish a claim for breach of contract under New York law, a plaintiff must show (1) the existence of contract, (2) performance by the plaintiff, (3) breach by the defendant, and (4) damages as result of the breach. *Diesel Props S.r.l. v. Greystone Business Credit II LLC*, 631 F.3d 42, 52 (2d Cir. 2011). The Complaint asserts that Plaintiffs entered into valid, binding and enforceable agreements, either express or implied in fact, with Walgreens, Catalina and NCH to participate in the Register Rewards program. (Second Am. Compl. ¶¶ 171, 173-76.) The Complaint further alleges that Walgreens breached the agreement by charging Plaintiffs for improperly redeemed coupons, that Catalina breached by printing and issuing coupons for discounts or rebates never extended and that NCH breached by inappropriately billing them for those coupons. (Second Am. Compl ¶¶ 180, 181, 182.) Walgreens, Catalina and NCH primarily contend that these claims should be dismissed because the Complaint does not sufficiently plead the existence of a contract.

The elements of contract formation are: (1) offer, (2) acceptance, (3) consideration, (4) mutual assent, and (5) mutual intent to be bound. *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 427 (2d Cir. 2004). Contracts can be created expressly, but "[a] contract implied in fact may

11

result as an inference from the facts and circumstances of the case, although not formally stated in words, and is derived from the 'presumed' intention of the parties as indicated by their conduct." *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 506–07 (2d Cir. 2009) (quoting *Jemzura v. Jemzura*, 36 N.Y.2d 496, (1975) (internal citations omitted)). An implied in fact contract is "as binding as one that is express, and similarly 'requires such elements as consideration, mutual assent, legal capacity and legal subject matter.'" *Id.* at 507 (quoting *Maas v. Cornell Univ.*, 94 N.Y.2d 87, (N.Y. 1999)); *see also Carter v. Katz, Shandell, Katz and Erasmous*, 465 N.Y.S.2d 991, 996 (Sup. Ct. 1983) ("The only difference between an express contract and a contract implied in fact is that in the former the parties arrive at their agreement by words, while in the latter their agreement is arrived at by a consideration of their acts and conduct; in both cases there is, in fact, a contract between the parties, the only difference being the character of the evidence necessary to establish it."). Thus, similar to express contracts, in order to survive a motion to dismiss, a plaintiff alleging a contract implied in fact must be able to "point to 'sufficient specific, concrete, factual representations such that they could be interpreted to supply the terms of an implied contract." *Hudson & Broad, Inc. v. J.C. Penney Corp., Inc.*, No. 12 Civ. 3239(KBF), 2013 WL 3203742, at *3 (S.D.N.Y. June 18, 2013) (quoting *Sang Lan v. Time Warner, Inc.*, No. 11–cv–2870, 2013 WL 1703584, at *5 (S.D.N.Y. Apr. 19, 2013)).

In this case, the Court finds that the Complaint sufficiently pleads the existence of an agreement, whether express or implied in fact, between OTG and Walgreens. Specifically, the Complaint alleges that, at some point after December 2011, OTG was approached by Walgreens with an offer to participate in the Register Rewards promotion, under terms and conditions including the guidelines stated on the vendor portal, with the promise of an increase in Walgreens' offering of their product if they did participate. (*See, e.g.*, Second Am. Compl. ¶¶

12

53-55, 59-64, 74.) The Complaint further alleges that at some point after December 2011 OTG agreed to participate, and that they ultimately participated in a one-week promotion from February 26 from March 3, 2012. (*See, e.g.*, Second Am. Compl. ¶¶ 57, 76.) The Complaint therefore explicitly alleges the elements of an offer, acceptance and consideration, and also pleads sufficient allegations regarding the conduct and acts of OTG and Walgreens in connection with the promotion to support a plausible inference of mutual assent and intent to be bound by both parties. *Maffea v. Ippolito*, 247 A.D.2d 366, (2d Dep't 1998) ("[t]he manifestation or expression of assent necessary to form a contract may be *by word, act, or conduct* which evinces the intention of the parties to contract") (emphasis added).

The Court likewise finds that the Complaint has adequately pleaded that Walgreens breached the contract. Specifically, the Complaint alleges that Walgreens breached by, *inter alia*, charging and refusing to refund OTG for coupons which were inappropriately issued and/or redeemed. (*See, e.g.*, Second Am. Compl. ¶ 180.) Irrespective of whether the promotion guidelines noted in the vendor portal were incorporated into the terms of the purported contract between the parties, Walgreens' conduct as alleged in the Second Amended Complaint could certainly be found to violate the duty of good faith and fair dealing, which is implied into all contracts under New York law. *Fasolino Foods Co. v. Banca Nazionale Del Lavoro*, 961 F.2d 1052, 1056 (2d Cir. 1992) (parties to contract are bound "by an implied duty of good faith" and breach of the implied duty "is merely a breach of the underlying contract"); *Times Mirror Magazines, Inc. v. Field & Stream Licenses Co.*, 103 F. Supp. 2d 711, 735 (S.D.N.Y. 2000) (a party breaches duty of good faith "when it does something that 'destroy[s] or injure[s] the right of another party to receive the benefits of the contract'" quoting *Chase Manhattan Bank, N.A. v.*

13

*Keystone Distribs., Inc.*, 873 F.Supp. 808, 815 (S.D.N.Y. 1994)).  Walgreens' motion to dismiss

the breach of contract claim must be denied as OTG.

In contrast, however, the Court finds that the Complaint does not plead the existence of a

contract between any other plaintiff and defendant.  The Complaint is utterly devoid of

allegations which would give rise to an inference of an express or implied-in-fact contract

between DNE and Walgreens, Catalina or NCH, or between OTG and Catalina or NCH.

Plaintiffs have not alleged any words or conduct by either party that constitute offer, acceptance,

or mutual assent and intent to be bound.  Indeed, Plaintiff tacitly acknowledge this fact, and have

argued on this motion that they alternatively were third-party beneficiaries of contracts between

Walgreens and Catalina and NCH.  This argument is unavailing, however.

A party asserting a third-party beneficiary claim must allege the existence of a valid and

binding contract between other parties which was intended for his or her immediate, as opposed

to incidental, benefit, so as to "indicate the assumption by the contracting parties of a duty to

compensate [him or her] if the benefit is lost.'" *Nanomedicon, LLC v. Research Found. of State*

*Univ. of N.Y*, 112 A.D.3d 594, 596 (3d Dep't 2012) (quoting *State of Cal. Pub. Emps' Ret. Sys. v.*

*Shearman & Sterling*, 95 N.Y.2d 427, 434-35 (2000)).  The New York Court of Appeals has held

that, where a plaintiff is unable to plead the pertinent terms of the agreement under which it

claims third-party beneficiary status, he or she is necessarily unable to plead that the agreement

was intended for his or her immediate benefit, and thus cannot survive a motion to dismiss.  *See*

*Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 182 (2011) (affirming grant of motion to

dismiss complaint on that basis); *see also Bristol Village, Inc. v. Louisiana-Pacific Corp.*, 916 F.

Supp. 2d 357, 363 (W.D.N.Y. 2013) (rejecting third-party beneficiary argument where complaint

contained "only a general reference to a non-specified sales contract").  In this case, as Plaintiffs

14

have not pleaded the salient (or any) terms of NCH and Catalina's agreements with Walgreens, or any other facts giving rise to the plausible inference of their third party status, their third-party beneficiary claims must be dismissed.

### D. Unjust Enrichment

Plaintiffs allege that Walgreens, Catalina and NCH were unjustly enriched when OTG paid them $352,916.77 for coupons that were not properly redeemed, and that Walgreens was further enriched by being paid $110,615 in contravention of the price reduction agreement. (*See, e.g.*, Second Am. Compl. ¶¶ 200-12, 223-30.) In order to state a claim for unjust enrichment, a plaintiff must allege "that (1) the other party was enriched, (2) at that party's expense, and (3) that 'it is against equity and good conscience to permit [the other party] to retain what is sought to be recovered.'" *Mandarin Trading Ltd.*, 16 N.Y.3d at 182 (alteration in original) (quoting *Citibank, N.A. v. Walker*, 12 A.D.3d 480, 481 (2d Dep't 2004); *Baron v. Pfizer, Inc.*, 42 A.D.3d 627, 629-30 (3d Dep't 2007)). The second and third elements bear emphasizing; in order to be successful, a plaintiff must not only show that a defendant received a benefit, but also that the plaintiff conferred it and that there is some equitable basis for the court to compel its return. *See, e.g.*, *Woods v. 126 Riverside Dr. Corp.*, 64 A.D.3d 422 (1st Dep't 2009); *Hansen & Co. v. Everlast World's Boxing Headquarters, Corp.*, 296 A.D.2d 103, (1st Dep't 2002). In addition, although privity between the plaintiff and defendant is not required, an unjust enrichment claim does not lie where "the connection between the parties is too attenuated." *Mandarin Trading Ltd.*, 16 N.Y.3d at 182 (citing *Sperry v Crompton Corp.*, 8 N.Y.3d 204, 215 (2007)).

In this case, the Court finds that only OTG's unjust enrichment claims against Walgreens (Counts IV and VI) are viable. It is well-settled that where, as here, there is a bona fide dispute between the parties over the existence of a contract, the plaintiff can maintain an unjust

15

enrichment claim in the alternative. *Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162, 203 (S.D.N.Y. 2011). Moreover, the Court finds that if Walgreens acted in the manner alleged in the Complaint, OTG would possess a viable claim that Walgreens has been unjustly enriched, even in the absence of an enforceable contract.

In contrast, all of DNE's unjust enrichment claims fail because the Complaint does not allege that DNE *conferred any benefit* on Walgreens, Catalina or NCH, and the connection between DNE and these parties appears too attenuated in any event. And, while the Complaint does allege that OTG conferred benefits on Catalina and NCH—i.e., in whatever portion of the $352,916.77 they retained—it does not allege facts permitting the inference that the retention of such benefits is in anyway inequitable, especially given Catalina and NCH's peripheral roles in the administration of the Register Rewards promotion. These unjust enrichment claims are therefore dismissed.

### E. Conversion

Walgreens, Catalina and NCH similarly move to dismiss Plaintiffs conversion claims which are similarly premised on the $352,916.77 and $110,615 the Complaint alleges OTG paid. "Two key elements of conversion are (1) plaintiff's possessory right or interest in the property and (2) defendant's dominion over the property or interference with it, in derogation of plaintiff's rights." *Pappas v. Tzolis*, 20 N.Y.3d 228, 234 (2012) (quoting *Colavito v. N.Y. Organ Donor Network, Inc.*, 8 N.Y.3d 43, 50 (2006)). If the property at issue is money, it "'must be specifically identifiable and be subject to an obligation to be returned or to be otherwise treated in a particular manner.'" *Rentrak Corp. v. Handsman*, No. 12–CV–1576(JS)(ARL), 2014 WL 1342960, at *7 (E.D.N.Y. Mar. 31, 2014) (quoting *Key Bank of N.Y. v. Grossi*, 227 A.D.2d 841, 843 (3d Dep't 1996)). In addition, "[w]here a conversion claim is grounded in a contractual

dispute, the plaintiff 'must show acts that were unlawful or wrongful as opposed to mere violations of contractual rights.'" *Id.* at *8 (alteration in original) (quoting *In re Refco Sec. Litig.*, 759 F. Supp. 2d 301, 327 (S.D.N.Y. 2010)); *see also Citadel Mgmt., Inc. v. Telesis Trust, Inc.*, 123 F. Supp. 2d 133, 148 (S.D.N.Y. 2000) ("For a conversion claim to succeed in the context of a dispute regarding a contract, the breach of contract must result in some 'wrong' that is separately actionable.").

Applying these principles, it is clear that Plaintiffs' conversion claims must be dismissed in their entirety.  DNE, for example, does not identify any property in which they have title or right, either money or otherwise, that Walgreens, Catalina or NCH currently have dominion over.  Both of OTG's conversion claims against Walgreens, moreover, plainly derive from the same injuries and damages sought in their breach of contract and unjust enrichment claims.  *See Ellington Credit*, 837 F. Supp. 2d at 204.  And, with respect to the claim premised on the Register Rewards promotion, OTG does not, as required, allege a specific identifiable sum of money that was converted by Walgreens, Catalina or NCH, but instead seeks at least $282,333.42.  (Second Am. Compl. ¶ 191); *see also Global View Ltd. Venture Capital v. Great Central Basin Exploration, L.L.C.*, 288 F. Supp. 2d 473, 480 (S.D.N.Y. 2003) (dismissing conversion claim where complaint referred to "monies and assets . . . in an amount in excess of $75,000").

Additionally, as to NCH in particular, the claim fails for the separate reason that the only money in its possession is the portion it retained for its processing fees—money which the Complaint *does not assert* rightfully belongs to Plaintiffs.  NCH's remittance of the balance of the $352,916.77 to Walgreens is not actionable, moreover, given that there is no allegation that that transfer was at all wrongful.  *See, e.g., Regions Bank v. Wieder & Mastroianni, P.C.*, 526 F.

Supp. 2d 411, 415 (S.D.N.Y. 2007) (noting that several New York cases "stand for the principle

that one who comes into possession of property lawfully and then disposes of it will not be liable

for conversion unless that disposal was in some way wrongful").

For all these reasons, Plaintiffs' conversions claims are hereby dismissed.

### F.   Negligence

"[A] plaintiff must establish three elements to prevail on a negligence claim: (1) the

existence of a duty on defendant's part as to plaintiff; (2) a breach of this duty; and (3) injury to

the plaintiff as a result thereof." *Aegis Ins. Servs,, Inc. v. 7 World Trade Co., L.P.*, 737 F.3d 166,

177 (2d Cir. 2013)  (quoting *Alfaro v. Wal–Mart Stores, Inc.*, 210 F.3d 111, 114 (2d Cir. 2000)).

The threshold question of the "existence and scope of an alleged tortfeasor's duty is, in the first

instance, a legal question for determination by the courts." *Sanchez v. New York*, 99 N.Y.2d 247,

252 (2002) (internal citation omitted).  The duty must be independent of any contract, *Clark–*

*Fitzpatrick, Inc. v. Long Is. R.R. Co.*, 70 N.Y.2d 382, 389 (1987), and "[i]n general, there is no

duty of care between parties to an arm's-length business relationship." *Technical Support Servs.,*

*Inc. v. Int'l Bus. Machs. Corp.*, 18 Misc.3d 1106(A), at *28 (Sup. Ct. 2007) (citing *Atkins*

*Nutritionals, Inc. v. Ernst Young, LLP*, 301 A.D.2d 547, 548 (2d Dept. 2003)).

Plaintiffs' negligence claims here are dismissed because the Complaint does not

adequately allege the existence of a legally cognizable duty of care.  Rather, the Complaint

alleges that Walgreens, Catalina and NCH owed Plaintiffs' duties to act honestly in

administering the Register Rewards promotion, to advise Plaintiffs of the existence of the

*Imagenetix* complaint and the fact that Walgreens cashiers were allegedly engaging in fraud, and

to prevent and stop Walgreens cashiers from committing the alleged fraud.  (*See, e.g.*, Second

Am. Compl. ¶¶ 273-309.)  These allegations are "merely a restatement, albeit in slightly different

18

language, of the 'implied' contractual obligations asserted in the cause of action for breach of

contract." *Clark–Fitzpatrick*, 70 N.Y.2d at 390. "Merely charging a breach of a 'duty of due

care', employing language familiar to tort law," however, "does not, without more, transform a

simple breach of contract into a tort claim." *Id.*

### G. Motion to Strike Punitive Damages

In light of the foregoing, it remains only for the Court to consider whether OTG's prayer

of punitive damages from Walgreens on its surviving claims of breach of contract and unjust

enrichment should be stricken. Under New York law, punitive damages are unavailable for

unjust enrichment claims and other quasi-contract claims. *See Legurnic v. Ciccone*, No. 09–CV–

1436 (ADS)(AKT), 2014 WL 6674593, at *9-*10 (E.D.N.Y. Nov. 25, 2014). They are also

unavailable for claims of breach of contract, unless the breach involves "a fraud evincing a 'high

degree of moral turpitude' and demonstrating 'such wanton dishonesty as to imply a criminal

indifference to civil obligations,'" and was also "'*aimed at the public generally.*'" *U.S. for Use*

*and Benefit of Evergreen Pipeline Constr. Co. v. Merritt Meridian Constr. Corp.,* 95 F.3d 153,

160 (2d. Cir. 1996) (*quoting Rocanova v. Equitable Life Assur. Soc. of U.S.*, 83 N.Y.2d 603, 612

(N.Y. 1994)).

In this case, the Complaint does not allege that Walgreens' conduct was aimed at or

harmed the general public. Rather, the nature of the allegations suggest harm to only to OTG

and perhaps any other vendors who participated in the Register Rewards. Furthermore, many of

the Complaint's allegations belie a finding of a "fraud" committed with "wanton dishonesty,"

insofar as they assert that low-level agents of Walgreens perpetrated this scheme without

Walgreens' knowledge. (*See, e.g.*, Second Am. Compl. ¶ 87.) Thus, Plaintiff is precluded from

recovering punitive damages for its breach of contract claim as well.  Walgreens' motion to strike Plaintiff's demand for punitive damages is granted.

## IV.   BETRUS AND TM'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION

### A.  Legal Standards

Rule 12(b)(2) of the Federal Rules of Civil Procedure allows for dismissal where a plaintiff fails to carry his or her burden of showing the Court has jurisdiction to hear its claim.  *In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 206 (2d Cir. 2003).  To defeat a Rule 12(b)(2) motion, a plaintiff must "'plead[ ] in good faith, legally sufficient allegations of jurisdiction,' i.e., by making a '*prima facie* showing' of jurisdiction." *Jazini v. Nissan Motor Co., Ltd.*, 148 F.3d 181, 184 (2d Cir. 1998) (internal citations omitted); *accord Troma Entm't Inc. v. Centennial Pictures Inc.*, 729 F.3d 215, 217 (2d Cir. 2013) ("In other words, a complaint will survive a motion to dismiss for want of personal jurisdiction so long as its allegations, taken as true, are 'legally sufficient allegations of jurisdiction.'" (citation omitted)).  "[W]here the issue is addressed on affidavits, all allegations are construed in the light most favorable to the plaintiff and doubts are resolved in the plaintiff's favor, notwithstanding a controverting presentation by the moving party." *A.I. Trade Fin., Inc. v. Petra Bank*, 989 F.2d 76, 79-80 (2d Cir .1993).  The Court, however, "will not draw 'argumentative inferences' in the plaintiff's favor" and need not "accept as true a legal conclusion couched as factual allegation." *Licci v. Lebanese Canadian Bank*, SAL, 673 F.3d 50, 59 (2d Cir. 2012) (internal citations omitted).

To determine whether it has personal jurisdiction over a non-domiciliary in a diversity action, a district court must engage in a two-step inquiry.  *First*, the court must decide if the defendant is subject to personal jurisdiction under the law of the forum state; here, New York's

long-arm statute.  N.Y. C.P.L.R. § 302; *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 124 (2d Cir. 2002).  *Second*, if there is personal jurisdiction in the forum state, the court must then consider whether the exercise of that jurisdiction comports with the Due Process Clause of the Fourteenth Amendment.  *Bank Brussels*, 305 F.3d at 124.

A plaintiff can establish personal jurisdiction under New York law by "demonstrat[ing] either that [the defendant] was 'present' and 'doing business' in New York within the meaning of [CPLR] § 301," commonly referred to as general jurisdiction, "or that [the defendant] committed acts within the scope of New York's long-arm statute, [CPLR] § 302[,]" commonly referred to as specific jurisdiction.  *Schultz v. Safra Nat'l Bank of N.Y.*, 377 F. App'x 101, 102 (2d Cir. 2010) (summary order).

### B.  Analysis

In this case, Plaintiffs argue that specific jurisdiction under CPLR § 302(a) exists over Betrus and TM Marketing, specifically under subsections (1) and (3).[4]  Betrus, meanwhile, has submitted an affidavit averring that neither he nor TM marketing ever met, performed any work for, or provided any services to Plaintiffs in New York.  (May 27, 2014 Betrus Aff. ¶¶ 8-9).  Betrus also avers that neither he nor TM Marketing performed any services for clients in New York, derived substantial revenue from New York or conducted business in New York.  (Betrus Aff. ¶¶ 11, 13-15.)  As indicated below, the Court agrees with Betrus and TM Marketing that neither Section 302(a)(1) or (a)(3) applies in this case.  Accordingly, the Court does not consider whether the exercise of jurisdiction would be consistent with due process.

---

[4]     Plaintiffs also argue that the Court should exercise personal jurisdiction under Rule 20(b) of the Federal Rules of Civil Procedures and 28 U.S.C. §§ 1404 and 1407.  These authorities simply do not provide a basis for exercising personal jurisdiction where it does not otherwise exist, however.

### 1.  CPLR § 302(a)(1)

"Section 302(a)(1) confers jurisdiction over a non-domiciliary corporation that 'transacts business within the state or contracts anywhere to provide goods and services in the state,' . . . if there is a 'direct relationship between the cause of action and the in state conduct.'" *C.B.C. Wood Prods., Inc. v. LMD Integrated Logistics Servs., Inc.*, 455 F. Supp. 2d 218, 224 (E.D.N.Y. 2006) (quoting *Fort Knox Music Inc. v. Baptiste*, 203 F.3d 193, 196 (2d Cir. 2000)).  In support of the exercise of jurisdiction under this provision, Plaintiffs cite to an August 4, 2009 Consultant Agreement ("Consultant Agreement") between TM Marketing and DNE, which provides that TM Marketing would take over responsibility of certain stores in the "Metro NY market." (Rebhun Decl. Ex. 1, at 1.)  Plaintiffs argue that this establishes personal jurisdiction over Betrus because it establishes that "(1) he transacted business within the state and (2) transferred/contracted to supply goods or services in the state."  (Pls.' Memo. of Law in Opp'n at 5.)

However, even assuming *arguendo* that Plaintiffs are correct, personal jurisdiction cannot be exercised under this provision because Plaintiffs have not shown or even argued that the dispute in this case arises from the Consultant Agreement.  *See Sole Resort, S.A. de C.V. v. Allure Resorts Mgmt.*, LLC, 450 F.3d 100, 104 (2d Cir. 2006) (noting where "the disputes could not be characterized as having 'arisen from' the New York activity[,]" there is not a "sufficient nexus between the parties' New York contacts and the claim asserted" to confer jurisdiction under § 302(a)(1)).

22

### 2. CPLR § 302(a)(3)

Under Section 302(a)(3), a court in New York may exercise jurisdiction over a non-domiciliary when the defendant: (1) committed a tortious act outside of New York; (2) that causes injury within New York. *Energy Brands Inc. v. Spiritual Brands, Inc.*, 571 F. Supp. 2d 458, 467 (S.D.N.Y. 2008) (citing N.Y. C.P.L.R. § 302(a)(3)). Additionally, the defendant must either: (a) regularly do or solicit business, engage in any other persistent course of conduct or derive substantial revenue from goods used or consumed or services rendered in the state, or (b) expect or should reasonably expect the act to have consequences in the state and derive substantial revenue from interstate or international commerce. *Id.* In this case, Plaintiffs argue that the exercise of jurisdiction over Betrus is permissible under this provision because he "derives substantial revenue from goods used or consumed or services rendered in New York" and "should be held accountable or expect to be accountable here in New York." (Pls.'s Memo. of Law in Opp'n at 5.)

Again, Plaintiffs' argument misses the mark. Even assuming *arguendo* that it is true that Betrus and/or TM Marketing derived substantial revenue and should expect to be accountable in New York, personal jurisdiction still cannot be premised on this provision because Plaintiffs have not offered, as required, any evidence or argument that TM Marketing or Betrus committed tortious acts which caused Plaintiffs injury inside of New York. The location of the injury requirement, moreover, is determined by "the location of the original event which caused the injury, *not the location where the resultant damages are subsequently felt by the plaintiff.*" *Mareno v. Rowe*, 910 F.2d 1043, 1046 (2d Cir. 1990) (emphasis added) (quoting Carte v. Parkoff, 152 A.D.2d 615, 616 (2d Dep't 1989)). Thus, as neither the Complaint nor Plaintiffs' submissions on this motion contend that Betrus and TM Marketing's alleged acts of

misrepresentation, breach of fiduciary duty and negligence occurred in New York, personal

jurisdiction is not available under Section 302(a)(3).

## V.      CONCLUSION

For the reasons stated above, Walgreens and Catalina's motion to dismiss (ECF No. 38)

is **GRANTED IN PART AND DENIED IN PART**.  All claims asserted by Plaintiff DNE and

all claims asserted against Defendant Catalina are hereby **DISMISSED**.  Counts I, III, and V

through VIII are **DISMISSED** as against Defendant Walgreens.

Defendant NCH and Defendants Betrus and TM Marketing's motions to dismiss (ECF

Nos. 40 & 42) are **GRANTED**.

The Court will also hold a status conference on **April** 16**, 2015 at** 11 **:** 30 a **.m.**

Counsel for OTG and Walgreens should report in person to Courtroom 1306 at the Thurgood

Marshall United States Courthouse, 40 Foley Square, New York, NY at that date and time.

**SO ORDERED.**

**Dated:** March 31, 2015

   **New York, New York**

                                    **ANDREW L. CARTER, JR.**
                                    **United States District Judge**